[No. 129. *En Banc.* March 19, 1920.]

*In the Matter of the Proceedings for the Disbarment of*
JOHN W. ARCTANDER.[1]

ATTORNEY AND CLIENT (7) — DISBARMENT — GROUNDS — DISLOYAL
CONDUCT. The preparation of a petition to the Norwegian embassy
at Washington for the release from military services of Norwegian
subjects, and the charging of compensation for such services, is not
unethical or disloyal so as to warrant the disbarment of an attorney.

SAME (7)—An attorney should be disbarred for conduct violating
the standard of ethics of the American Bar Association, as author-
ized by Laws 1917, p. 431, § 20, where he refused the President's
request to assist registrants in the preparation of their question-
naires, especially equipped his office to assist resistances to the call,
assisting over four hundred registrants whom he charged five dol-
lars each, and assisted two hundred registrants in the preparation
of the affidavit to withdraw intention of becoming a citizen of the
United States, charging each ten dollars, becoming the advocate,
not the legal advisor, of the slacker and those who were willing to
renounce their claim to citizenship.

Proceeding filed in the supreme court June 5, 1919,
for the disbarment of an attorney, upon the findings of
the state board of law examiners against the accused.
Judgment of disbarment.

*The Attorney General* and *R. M. Burgunder, Assist-*
*ant,* for the State.

*John W. Arctander, pro se.*

MAIN, J.—The state board of law examiners pre-
pared, filed, and served upon John W. Arctander, a
licensed attorney of this state, a complaint charging
him with unpatriotic, unethical, and unprofessional
conduct. Mr. Arctander answered the complaint, a
hearing was had, evidence taken, and the board made
findings of fact and conclusions recommending perma-

[1]Reported in 188 Pac. 380.

nent disbarment. The board also prepared and filed a formal opinion, which, after the evidence has been read and considered, we adopt. It is as follows:

"The President of the United States, on November 8, 1917, prescribed rules and regulations under the authority vested in him by the selective service law, which had been passed by Congress May 18, 1917. These regulations were known as the 'Selective Service Regulations.' They provided for the registration of persons subject to military service, and for the filing of questionnaires by such persons before the local exemption boards. Sections 45 and 46 prescribed the duties of lawyers relative to the assisting of registrants in the preparation of their questionnaires and aiding generally in just administration of said law and regulations. These sections are as follows:

" 'Section 45. Legal Advisory Boards.

" 'There has been provided in the various counties, cities, and other localities throughout the United States, Legal Advisory Boards, composed of disinterested lawyers, with associate members consisting of capable lawyers and laymen, to be present at all times during which Local Boards are open for the transaction of business, either at the headquarters of Local Boards or at some other convenient place or places, for the purpose of advising registrants of the true meaning and intent of the Selective Service Law and of these Regulations, and of assisting registrants to make full and truthful answers to the Questionnaire, and to aid generally in the just administration of said Law and Regulations.

" 'Section 46. Duties of Lawyers and Physicians Generally.

" 'The selection and classification of men for military service is an undertaking that should be regarded as a systematized effort of the citizenry of the whole Nation organized and compacted to meet the present emergency. Every citizen has a duty to give his best endeavor to the success of this undertaking according to his qualifications and talents. All lawyers and physicians should regard it as their duty to identify

themselves with the Advisory Boards provided for in sections 44 and 45, and freely and without compensation to give their best service to the Nation. It is inconsistent with this duty for lawyers to seek clients for the purpose of urging and advocating individual cases in any other way than as disinterested and impartial assistants of the Selective Service System.'

"The President, in prescribing these regulations, directed that they be published for the government of all concerned and that they be strictly observed. In the foreword attached to the regulations, the President said:

" 'The time has come for a more perfect organization of our man power. The selective principle must be carried to its logical conclusion. We must make a complete inventory of the qualifications of all registrants in order to determine, as to each man not already selected for duty with the colors, the place in the military, industrial or agricultural ranks of the nation in which his experience and training can best be made to serve the common good. This project involves an inquiry by the Selective Boards into the domestic, industrial and educational qualifications of nearly ten million men.

.　.　.　.　.　.　.　.

" 'I call upon all citizens, therefore, to assist Local and District Boards by proffering such service and such material conveniences as they can offer and by appearing before the boards, either upon summons or upon their own initiative, to give such information as will be useful in classifying registrants. I urge men of the legal profession to offer themselves as associate members of the Legal Advisory Boards to be provided in each community for the purpose of advising registrants of their rights and obligations and of assisting them in the preparation of their answers to the questions which all men subject to draft are required to submit.'

"On August 31, 1918, the President, by proclamation, called for the registration of men between the ages of 31 and 46. In that proclamation he said:

" 'By the men of the older group now called upon, the opportunity now opened to them will be accepted with the calm resolution of those who realize to the full the deep and solemn significance of what they do. Having made a place for themselves in their respective communities, having assumed at home the graver responsibilities of life in many spheres, looking back upon honorable records in civil and industrial life, they will realize as perhaps no others could, how entirely their own fortunes and the fortunes of all whom they love are put at stake in this war for right, and will know that the very records they have made render this new duty the commanding duty of their lives. They know how surely this is the Nation's war, how imperatively it demands the mobilization and massing of all our resources of every kind. They will regard this call as the supreme call of their day and will answer it accordingly.

" 'Only a portion of those who register will be called upon to bear arms. Those who are not physically fit will be excused; those exempted by alien allegiance; those who should not be relieved of their present responsibilities; above all, those who can not be spared from the civil and industrial tasks at home upon which the success of our armies depends as much as upon the fighting at the front. But all must be registered in order that the selection for military service may be made intelligently and with full information. This will be our final demonstration of loyalty, democracy, and the will to win, our solemn notice to all the world that we stand absolutely together in a common resolution and purpose. It is the call to duty to which every true man in the country will respond with pride and with the consciousness that in doing so he plays his part in vindication of a great cause at whose summons every true heart offers its supreme service.'

"It is clear that lawyers were called upon by the government to assist registrants in the preparation of their questionnaires and to aid generally in the just administration of the selective service law and regulations and to give their best service to the nation freely

and without compensation. Two purposes were to be served thereby. The registrant was to have the service of trained lawyers in order that his questionnaire might be prepared quickly, accurately, and truthfully, and the government was to have the service of the lawyer in order that it might obtain the necessary detailed information about the registrant so that the man power of the nation might be mobilized as quickly as possible for the purpose of winning the war with Germany. Every other object was to be subordinated by the loyal citizen to the nation's urgent need.

"Having in view the nation's need and the duty of the lawyer under the President's call for service, we will now come to the examination of the conduct of the respondent in this case relative to the services that he performed for registrants under the selective service law. Questionnaires were sent out by the local boards to the men between the ages of 21 and 31, commencing on December 15, 1917, and ending on January 9, 1918. These questionnaires were to be returned by the registrant to the local board within seven days from the date of the mailing. The legal advisory board of King county, which had been appointed by the Governor. organized the lawyers of that county, who volunteered, as associate members. Respondent, at that time, was trying a case in Tacoma, and for that reason did not become an associate member of the legal advisory board of King county, as his duties in the trial of that case kept him in Tacoma the whole period under which questionnaires were sent out under the first registration. He knew of the regulations and he knew of the organization of the King county legal advisory board. At that time he was associated with a firm of lawyers in Tacoma who were associate members of the legal advisory board of Pierce county, and in one or two instances he assisted registrants in preparing their questionnaires in Tacoma, and made no charge therefor because, as he said, these registrants came to the Tacoma lawyers whose duty it was as associate legal advisors to render such service gratuitously. Upon his return to Seattle, after that registration was com-

pleted, he thought, as everyone else did, that there
would be no further questionnaires sent out. He was
consulted by certain persons in the military service
who claimed to be Norwegian subjects, and wished to
enlist the Norwegian embassy at Washington in ob-
taining their release from military service. He pre-
pared petitions to the Norwegian embassy for fifty-two
of such persons, and received for such service and for
counsel relative thereto the sum of about $1,600. He
also assisted a few registrants from Alaska in prepar-
ing their questionnaires, and charged them each $5
therefor. These services on the part of the respondent
continued from about February, 1918, to the middle
of the summer. In June, 1918, registrants who had
attained the age of twenty-one were required by law
to register and return questionnaires. Respondent
assisted some few of these in preparing their ques-
tionnaires, and charged them each $5 therefor, but his
work in assisting in the preparation of questionnaires
up to September, 1918, was limited to a few isolated
cases. When the President, in August, 1918, called for
the registration of the class of thirty-one to forty-six,
and the making out and filing of questionnaires by that
class, respondent did not then join the legal advisory
board. The questionnaires were sent out to that class,
commencing the 18th of September and continuing
until the date of the armistice, November 11, 1918.
During that time, the respondent acted as attorney for
many registrants of Scandinavian birth or parentage,
and charged them each the sum of $5. Most of that
work was done during the month of October. In all,
he assisted four hundred and one registrants in the
preparation of their questionnaires, and received
therefor as fees the sum of $2,005. Shortly after he
had begun this work, the government appeal agent for
the city of Seattle called his attention to the fact that
he was at least violating the spirit of the selective serv-
ice regulations, and his partner and other friends ad-
vised him to desist. Nevertheless, he continued to
charge for such work. He resented the action of the
President of the United States in asking lawyers to

render these services without charge. He testified that he felt that the President did not have the right to command the services of the bar, and that it was an imposition on the bar to ask them to do that work for nothing; that these registrants were his clients and that his clients had to pay him and always have had to pay. He therefore organized his office especially to take care of this work, employing extra stenographic help and devoting his entire time thereto.

"In addition to this work, he assisted two hundred registrants in the preparation of the affidavit of the registrant to withdraw his intention of becoming a citizen of the United States. For these services he charged each registrant the sum of $10, receiving therefor the total compensation of $2,000. This affidavit was on a form prepared by the government, as follows:

" 'State of........................, County of........................, ss.

" 'I, ................................, do solemnly swear—affirm— that I reside at................................; that I am registered with Local Board for................................; that my order number is............; and that I am a citizen or subject of................................, which is neutral in the present war. I further swear— affirm—that on the............day of........................, I declared my intention to become a citizen of the United States in the................court of................at................under the name of................................; that I hereby withdraw my intention to become a citizen of the United States, which withdrawal I understand shall operate and be held to cancel my declaration of intention to become a citizen of the United States and shall forever debar me from becoming a citizen of the United States in accordance with the act of Congress approved July 9, 1918; (a) that I herewith surrender my original duplicate copy of my declaration of intention to become a citizen of the United States, serial number............ (b) that my original duplicate copy of my declaration of intention to become a citizen of the United States is not in my possession for the reason that................................but I undertake to surrender said copy of my declaration of intention to become a citizen of the United States should it at any time come into my possession; and I do hereby

claim relief from liability to military service in accordance with the law and regulations.

" ' (Signature of registrant) .
" 'Subscribed and sworn to before me this..............day of........................, 191......

" ' (Signature of Officer)

" ' (Designation of Officer) '

"We do not think that the service rendered by the respondent in preparing petitions to be presented to the Norwegian Embassy in asking the State Department of the United .States for the release of Norwegian subjects from military service, under the provisions of the treaty of the United States with Sweden and Norway, were either unethical or disloyal. These were not services which were due to registrants under the regulations of the President. They had a right to employ a lawyer to prepare a petition, and the lawyer had a right to represent them. Those were questions for each loyal citizen to settle with his own conscience and we have no criticism to offer as to the conduct of the respondent relative thereto. His correspondence, however, with the Norwegian Embassy shows such a spirit of criticism towards the military authorities and such an apparent lack of interest in the result of the war that it helps to explain his subsequent conduct. In a letter to the Norwegian Embassy of August 14th, relative to a certain registrant who claimed to be a Norwegian citizen, but who had waived his claim to exemption on the ground of alienage, respondent speaks of his being drawn into a fight *in which he has no interest* and to give his life *for a cause that is nothing to him.*

"When respondent said that this person, who had lived several years in the United States and had enjoyed the blessings of its freedom and opportunities, had no interest in its war with Germany, and that this country's cause was nothing to him, he simply voiced his own sentiments. Respondent's conduct all during the war shows no feeling on his part that the result of

that war was of any importance to him. When other men were freely giving all their time, their money to the cause, and when the youth of the land were gladly turning aside from the paths of peace to fight and, if need be, to die for their country, this respondent only saw in it an opportunity to make money. He resented the President's call to the lawyers to serve the nation and its registrants voluntarily, freely and without charge. He did just what the regulations asked the lawyers not to do. He became the advocate for the man who was seeking to escape military service. He refused to make out questionnaires for registrants who had no claim for exemption. He refused to perform services whereby the War Department could obtain the information which it needed for the classification of registrants for military and industrial service. He became the advocate, and not the disinterested advisor, of the slacker and of men who were even willing to renounce their intention to become American citizens— men whom he himself called sneaks.

"His excuses are that he advised with the chairman of the legal advisory board of King county, who saw no objection to his charging for his services. It is perfectly plain from the record that, at the time he called upon the chairman of the legal advisory board of King county, no one expected that any further work would be needed upon questionnaires, and that he therefore must only have consulted him relative to the petitions of the Norwegian Embassy. He and his partner also consulted the United States attorney relative to the ethics of his conduct. The United States attorney informed him that the mere matter of charging a person for executing a questionnaire, who was informed of a right to have it done freely by members of the advisory boards, and who insisted upon the employment of his own attorney, was not unethical, as it was a question between an attorney and client, and that was the only question he had in mind. That might have helped the respondent if his services had merely been performed in one or two isolated cases, but when he made a wholesale practice of doing just what the President had asked lawyers not to do, a

different question is presented. He cites us to his conduct in making a speech in Tacoma in May, 1917, and in buying liberty bonds and in subscribing to the Red Cross. If men's conduct is to be weighed by their words rather than their actions, respondent's speech in Tacoma might be a good defense. An examination of that speech in Tacoma, however, shows that his own attitude towards the war was not the attitude which he recommended to others. He urges them to give freely of their time and their money in the nation's cause, and then goes out and refuses to give either time or money or to do anything without pay. Relative to the purchase of liberty bonds by him, it is worthy of notice that he bought no liberty bonds of the first or second issue. He bought two $100 bonds of the third issue. This issue was sold in the spring of 1918. Of the fourth issue, which was sold in the latter part of October, 1918, he bought $800 in bonds. This purchase was made after his conduct had been subject to investigation by the intelligence bureau of the War Department, which had taken possession of his correspondence. These purchases of liberty bonds under the circumstances are, in our opinion, no evidence of loyalty. Neither is the contribution which he claims to have made to the Red Cross of $100 during the two years of the war. His income, as he testifies, was from $8,000 to $10,000 a year. While he is entitled to credit for the contribution that he made, we are not impressed with the argument that it proves anything as to his conduct which is under criticism.

"The legislature of this state, by § 20, ch. 115, Laws 1917, p. 431, has adopted the Code of Ethics of the American Bar Association as the standard of ethics and guide by the members of the bar of this state. Under that act, this board has the authority to recommend to the supreme court for disbarment all persons whose conduct is in violation of the purpose and spirit of that act. Canon 32 of the Code of Ethics, American Bar Association, defines the lawyer's duty in its last analysis, as follows:

" 'But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust

and to public duty, as an honest man and as a patriotic and loyal citizen.'

"From the respondent's own admissions and actions, we are regretfully forced to the conclusion that his conduct in performing services for registrants under the selective service law was disloyal, mercenary, unethical and unprofessional. Had the bar of the United States assumed the same attitude in response to the President's call to duty that respondent did, it would have called down upon itself the reprobation of the nation. It would have been disgraced to eternity. It is the duty of the lawyer, above all others, to serve his country, and his services should always be at his country's call in times of need. We feel that the respondent should not be allowed to practice law before the courts of this state, and we, therefore, respectfully recommend his permanent disbarment."

It is therefore the judgment of this court that the license heretofore granted Mr. Arctander to practice law in this state be revoked, that he be disbarred and his name stricken from the rolls.

HOLCOMB, C. J., FULLERTON, PARKER, BRIDGES, MITCHELL, and MOUNT, JJ., concur.

MACKINTOSH, J., took no part.